### No. 2218
### Second Circuit Appeal

### THRIFT OIL AND GAS COMPANY, INC., v. THERMATOMIC CARBON COMPANY

---

(May 9, 1925, Opinion and Decree.)

---

(*Syllabus by the Editor.*)

1. **Louisiana Digest—Sales—Par. 42, 52, 58.** The meaning of the clause, "Thrift agrees to sell and hereby does sell to the Trustee, and the Trustee agrees to buy and hereby does buy from Thrift for a period of ten (10) years from March 1st, 1922," in a contract is that Trustee is to begin paying for gas delivered from March 1st, 1922. The construction placed on contract by the actions of plaintiff and defendant shows this correct.
(Civil Code, Art. 1956. Editor's note.)

2.—**Louisiana Digest—Act of God—Par. 1.** Where defendant shut down the plant for the purpose of putting in new parts and changing other parts which were not suited for the work at hand, the shutdown was not an accident or cause beyond the control of the defendant.

Appeal from Sixth Judicial District Court of Louisiana, Parish of Ouachita, Hon. Fred. M. Odom, Judge.

This is a suit to recover for gas contracted for by defendant.

There was judgment for plaintiff and defendant appealed.

Judgment affirmed.

George Gunby, of Monroe, attorney for plaintiff, appellee.

McHenry, Montgomery, Lamkin & Lamkin, of Monroe, attorneys for defendant, appellant.

REYNOLDS, J. This is a suit by Thrift Oil & Gas Company, Inc., to recover judgment for $1860.00 against Thermatomic Carbon Company for gas contracted for by defendant from the gas wells of plaintiff for the months of July and August, 1923, under a contract reading, in part, as follows:

"This agreement made this 16th day of December, 1921, between Thrift Oil & Gas Company, Inc., a corporation organized under the laws of Louisiana, having its principal office in the City of Monroe, State of Louisiana, (hereinafter referred to as Thrift), party of the first part, and E. N. Gillespie, of Freeport, Pennsylvania, as Trustee (hereinafter referred to as the Trustee), party of the second part:

First: Thrift agrees to sell and hereby does sell to the Trustee and the Trustee agrees to buy and hereby does buy from Thrift for a period of ten (10) years from March 1st, 1922, all the gas which may be required for the operation of a carbon plant to be erected on or near the above mentioned Smith lease up to a monthly average of five million (5,000,000) cubic feet of gas per day, at and for the price of three (3)cents per thousand cubic feet, measured at eight (8) ounce pressure above atmosphere. The Trustee monthly shall pay for a daily average of one million (1,000,000) cubic feet of gas per day whether or not gas to that amount has been taken by the above mentioned plant, unless the plant is shut down on account of accidents or other causes beyond the control of its owners. (Exclusive of market conditions.) In such event the Trustee shall not be required to pay for any gas not used and if the shutdown should extend beyond a period of three months, Thrift shall have the right to sell gas to other parties until such time as the plant resumes operations."

\* \* \*

Defendant denied liability for the minimum of gas contract for the months of July and August, 1923, and asked, in reconvention, for $5520.00 paid plaintiff by defendant through error for the minimum of gas provided for in the contract during the months of March, April, May, June, July and August, 1922, during which time the plant was being constructed and before the plant had begun to use the minimum of gas provided in the contract.

On these issues the case went to trial. There was judgment in the lower court for the plaintiff for the full amount sued for and rejecting defendant's reconventional demand. Defendant appealed.

## OPINION

In this case there are two questions presented for determination.

### I.

Was the date at which defendant was to begin paying for the minimum if 1,000,000 cubic feet of gas per day under the contract to begin March 1, 1922, or to begin when the plant was completed and ready to begin operations?

The terms of the contract appear to us to be plain and subject to but one construction. It says:

"Thrift agrees to sell and hereby does sell to the Trustee and the Trustee agrees to buy and hereby does buy from Thrift for a period of ten (10) years from March 1st, 1922. \* \* \* "

\* \* \*

From this language we are certain that the parties to the contract understood at the time they made it that defendant was to begin paying for the minimum of 1,000,000 cubic feet of gas per day on March 1, 1922, whether it used that amount of gas per day or not.

If there could be any doubt as to how the parties to the contract understood it, that doubt was removed by the construction the plaintiff and defendant placed on it immediately after the contract was entered into, for plaintiff began to pay defendant from March 1, 1922, for the minimum of gas provided for in the contract and paid monthly for said amount during the time its plant was being constructed.

Undoubtedly the parties to the contract construed it to mean that the minimum

of gas was to begin to be paid for from March 1st, 1922, and we concur in their construction of the contract.

Article 1956 of the Civil Code provides:

"When the intent of the parties is doubtful, the construction put upon it, by the manner in which it has been executed by both, or by one with the express or implied assent of the other, furnishes a rule for its interpretation."

II.

The second question to be decided is, was defendant's carbon plant shut down during the month of July and August, 1923, on account of accident or other causes beyond the control of its owner.

The contract provides:

"The Trustee monthly shall pay for a daily average of one million (1,000.000) cubic feet of gas per day whether or not gas to that amount has been taken by the above mentioned plant, unless the plant is shut down on account of accident or other causes beyond the control of its owners."

In interpretating the exception in the clause of the contract above quoted, we must read the entire clause and interpret it as a whole.

In the case of American Bridge Company vs. Glenmore District Company, (Ky.) 107 S. W. 279, the court said:

"Under the familiar rule of ejusdem generis the general language following the specific enunciation of the causes which prevented the appellant from being responsible for non-performance of its contract within the stipulated time must be limited to include causes similar to those set out; and, under this rule, we think it clear that the failure of the appellant to provide material with which to carry into effect its contract was not a circumstance beyond its reasonable control. None of the specified causes for non-responsibility could possibly be controlled by foresight on the part of appellant; but foresight would undoubtedly suggest, before making a contract so urgent in its nature as the one before us, that the material with which it was to be carried into effect should have been secured in advance, and therefore the failure to exercise these cannot be said to be a cause for non-fulfillment beyond the reasonable control of the appellant.

In Michel vs. American Central Insurance Co., 44 N. Y. Supp. 832, the court said:

"In a statute or in a contract where general words follow specific words, the general words are not construed to mean things of different kinds from those described by the specific words, but denote things of the same kind."

In Lehman vs. M. L. & T. R. Co., 115 La. 1, 4, 38 South. 873, the court said:

"The words 'accidental or uncontrollable events' known to the Civil Code Law of Louisiana, are equivalent of 'cas fortuit ou force majeure' of the French law and denote that which happens by a cause which we cannot resist, something which can neither be foreseen nor prevented."

Under these authorities we must determine from the evidence whether or not the plant was shut down "on account of accident or other causes beyond the control of its owners".

E. N. Florsheim testified (pages 10 and 11) regarding discussions that took place at and before the time the contract was signed, as follows:

"Q. Was that not, to your knowledge, and experiment?

"A. No, sir.

"Q. Had there ever been any carbon plant in operation on that process?

"A. Mr. Uhlinger told us in Pittsburg there was.

"Q. Was that not the experimental plant in order to see how it would work?

"A. No, he assured us if we put this gas in his line and after they were once running there would be no trouble.

"Q. Don't you know as a matter of fact that there was no plant at Pittsburg?

"A. No I do not. Took his word for it.

"Q. You don't mean to tell us he had a carbon plan in Pittsburg?

"A. No, but he told us to tie up our acreage, two gas wells, and when once the gas was turned in the line and once started —after he got the plant going, he would never stop as far as the plant was concerned.

"Q. He assured you that the experiment had been worked out in laboratory form and would work out in practice?

"A. He didn't tell us about the laboratory; he said he had a small plant in Pittsburg hooked up and we would never be worried about the plant being shut down on account of its being an experiment." ·

C. C. Boardman testified (pages 23, 26):

"Q. When did you become manager of the Sterlington Plant?

"A. I came down the last of February, 1923, and took over the plant on the 15th of February.

"Q. Was that just after Mr. Hodges left?

"A. Yes, sir.

"Q. Are you an engineer, Mr. Boardman?

"A. Yes, sir.

"Q. These different pieces of machinery-pipes, conveyors, sifters, etc., which you testify were replaced, last summer and fall, were they the original pieces of machinery and equipment that were placed in the plant when it was constructed—first constructed?

"A. Yes, substantially the original stuff. Some small fittings might have been renewed during that time. It was the original.

"Q. Was this machinery and the equipment that was replaced worn out?

"A. Not worn out; some of it had been twisted, due to not being strong enough.

"Q. Whether it was replaced because it was old and worn out or whether the reason for replacing it with other machinery and equipment was not rather because it had been found not to meet the requirements of the process that you were using?

"A. It didn't meet the requirements of the process.

"Q. That is, that machinery and equipment which you replaced it with was all of a different design and larger in size and better met the requirements of your process than the machinery and equipment which was originally installed?

"A. That's substantially it. The new sifters handled the work all right, the old one didn't; the new conveyors handled the work all right, the old ones didn't.

"Q. There was no break down of the plant or machinery in June, 1925, was there?

"A. Not that you would call a break down. On the 22nd we had to shut down break downs are constantly occurring and of course grow more aggravated as you go on. We had already decided to make this shut down and get new apparatus and get it in.

"Q. The work you did between the latter part of June and the middle of December, 1923, was not in the nature of repairs but was more of a complete overhauling and renewing and rebuilding of your plant was it?

"A. That's essentially it, yes sir.

"Q. Because the old plant and old equipment could not properly manufacture carbon with the process that you were using?

"A. Well, it is a distinction there. The carbon is manufactured in the furnaces; that process is all right, nothing wrong there; its after the carbon is made, in the handling of it, the apparatus it is put in, the sifters to prepare it to be put in sacks that was insufficient and couldn't do the work. That's the part of the plant we had to tear out.

"Q. How many binds did you replace?

"A. We did not replace the binds. We just changed the way the plates were put on top.

"Q. Would it not have been possible for you to have operated one or more units of your plant while the other units were being replaced?

"A. Only by shutting down for a week and making connections into a single collector and carrying the carbon by hand. The collectors are eight in a row from a common conveyor. To operate a single one would take a lot of temporary connections and handling of carbon by hand; sifting it by hand.

"Q. I don't recall—did you say all of the furnaces were relined?

"A. No, just one completely relined.

"Q. Had it not been for the changing of the conveyors and other carbon handling apparatus you would have continued to operate the rest of the furnaces while the one was being repaired?

"A. Yes. In normal operation any one furnace can be repaired without affecting the balance of the plant.

"Q. And the work done on the engines in the power house didn't necessitate a shut down over this long period of time either?

"A. That's just an ordinary maintenance job.

"Q. Probably take only a few days time?

"A. Yes. While we were down we had a master mechanic on that job to get it in good shape to run.

"Q. Then the five and a half months shut down .was occasioned solely by the reconstrction, replacement and enlargement of the machinery for handling the carbon black after it came from the furnaces?

"A. Yes, sir.

"Q. And its replacement and enlargement was caused by reason of the fact that the old equipment which you had was not of the proper design for handling the product—design and size?

"A. It was not the right size and it was not the right design, except there was not any data to go on in designing that sort of equipment. We had to go through all the processes once to see what we did have to have.

"Q. I believe you testified that you operated from September, · of 1922, until June of 1923, without making any changes?

"A. Well, some of the equipment was not in operation. We were doing by hand what equipment was supposed to do all that time. The center conveyor had failed completely to function like it should, and so we handled that carbon by hand.

"Q. Some of the new equipment which was added was to take the place of any do away with manual labor that had formerly been employed by the plant?

"A. Yes.

"Q. And it was because of faults and defects in the plant as originally designed and constructed. that the changes were made?

"A. Well, that depends ··somewhat on conditions. At the time the plant was designed and erected we put in the best equipment recommended by makers of that equipment. After the company installed that sort of equipment they found out it would not work. ' They took the best they had. Now the equipment we have is larger—stuff we worked out ourselves."

From this evidence we are convinced that the defendant after representing to the plaintiff that it had worked out a plant that was beyond the experimental stage and was entirely practicable, built its plant and placed therein certain parts that were not suitable and would not do the work for which said parts were intended, and that because of these parts not being suitable to do the work intended for them defendant found it necessary to shut down the plant for the purpose of putting in new parts and of changing other parts; and this it proceeded to do without saying a word to plaintiff.

This work, in our opinion, was not an accident or cause beyond the control of the defendant.

Reverting to Civil Code, section 1956.

Defendant paid the minimum amount for gas provided in the contract from March 1, 1922, while the plant was being built, and as the defendant considered the contract to mean that he should pay the minimum amount provided for in the contract for gas during the time the plant was being built, for a like reason we think it must be held for the minimum amount of gas provided in the contract during the time the plant was shut down for the adjustment and rearrangement of certain parts that should have gone in when the plant was being built.

For the above reasons, it is ordered, adjudged and decreed that the judgment of the trial court be affirmed.